William D. Bierman, Esq.
NOWELL AMOROSO KLEIN BIERMAN, P.A.
155 Polifly Road
Hackensack, New Jersey 07601
(201) 343-5001
Attorneys for Plaintiffs,
Kawasaki Kisen Kaisha, Ltd. and
Yang Ming Marine Transport Corporation

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY



| | |
|---|---|
| **KAWASAKI KISEN KAISHA, LTD and YANG MING MARINE TRANSPORT CORPORATION,** | Civil Action No. 2:12-CV-06178-SRC-CLW |
| **Plaintiffs,** | **FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, SPECIFIC PERFORMANCE AND BREACH OF CONTRACT** |
| **v.** | |
| **MAHER TERMINALS LLC** | |
| **Defendant.** | |

## INTRODUCTION

Plaintiffs, Vessel-Operating Ocean Common Carriers, bring this action to compel

defendant to abide by the terms of the Contract defendant has with each plaintiff. Plaintiffs

require judicial intervention to prevent what will become a significant disruption to international

trade, and with major monetary losses to plaintiffs as well as the local economy in the absence of

such intervention.

Plaintiffs, by and through their retained counsel, by way of the First Amended Complaint

against defendant state:

## JURISDICTION AND VENUE

Plaintiffs are Vessel Operating Ocean Common Carriers having a Stevedoring and Terminal Service Agreement with defendant for services at Port Elizabeth, New Jersey.

The Contract between plaintiffs and Maher Terminals LLC includes a venue and choice of law provision whereby the parties agree to have any dispute arising out of it to be filed in the State of New Jersey. As the dispute herein arises out of a Marine Stevedoring Contract this Court has jurisdiction pursuant to 28 USCA ¶ 1333. This Court has further diversity jurisdiction pursuant to 28 USCA ¶ 1332(a)(1) where the matter in controversy exceeds $75,000.00. The case is properly venued in the Federal District Court of New Jersey.

### I.     PLAINTIFFS

1.     Kawasaki Kisen Kaisha Co., Ltd (hereinafter referred to as "K" Line)

"K" Line is a Vessel Operating Ocean Common Carrier, FMC Organization No. 001466, with principal offices at 14th floor, Iino Building, 1-1 Uchisaiwaicho - Z – Chome, Chiyoda – ku, Tokyo, Japan.

2.     Yang Ming Marine Transport Corporation (hereinafter referred to as "Yang Ming") Yang Ming is a Vessel Operating Ocean Common Carrier, FMC Organization No.000138 with principal offices at 271 Ming De 1st Road, Chidu District, Keelung 20646, Taiwan (R.O.C.)

### II.    DEFENDANT

3.     Maher Terminals LLC (hereinafter referred to as "Maher")

Maher, as a Lessee of Port facilities in Elizabeth New Jersey, provides stevedoring and terminal services to Ocean Common Carriers at its facility with offices at 1210 Corbin Street, Elizabeth, New Jersey.

## III. FACTS COMMON TO ALL COUNTS

4. On or about August 28, 2009, both plaintiffs executed a Stevedoring and Terminal Services Agreement with defendant ("Contract" annexed hereto as Exhibit 1).

5. By Section 17 of the Contract, the term is for a period of five (5) years, beginning January 1, 2010 and expiring December 31, 2014, with two (2) options to extend its term of two (2) and three (3) years respectively.

6. By Section 19 of the Contract the parties agreed that any amendment, modification or supplementation thereof must be by "mutual consent expressed in writing" by the parties.

7. On January 1, 2010, each plaintiff undertook to comply with the terms of the Contract with defendant.

8. No plaintiff has been in default or has otherwise breached the Contract with plaintiff.

9. No provision in the Contract provides for, or allows for, defendant to suspend, interrupt or to terminate terminal services for non-payment of charges other than those specified in the Contract, nor to act as a collection or enforcement agent for any third party as against plaintiffs.

10. On or about February 2011, over a year after plaintiff's Contract with defendant became effective, the Port Authority of New York and New Jersey ("Port Authority") purported to impose, by Tariff, a charge (Container Facility Charge, or "CFC") on ocean common carriers whose container ships load or discharge in the Port, including plaintiffs, but its Tariff did not provide for the Port Authority to collect the charge.

11.     The Port Authority by Tariff also directed defendant Maher to collect the charges and to deny terminal services to any such ocean common carrier that does not pay the Port Authority's CFC charges for two (2) consecutive billing periods (totaling 60 days).

12.     Defendant Maher, has informed plaintiffs that, if either plaintiff fails to pay the Port Authority's charges for two (2) billing periods, it will deny terminal services to such party.

13.     Denial of terminal services by Maher for non-payment of any Port Authority charge is not authorized or allowable by any term of the Contract defendant has with plaintiffs, and Maher is in anticipatory breach of its Contract by asserting its intent to deny terminal services for nonpayment of the Port Authority CFC charge.

14.     Denial of terminal services by Maher would cause extraordinary damage to plaintiffs and would cause major disruption in service to all customers for whom plaintiffs receive or deliver goods via the Port of New York/New Jersey.

15.     Denial of terminal services by Maher would also cause significant financial harm to two other ocean common carriers with whom plaintiffs have an agreement for cross-chartering of container slots on their respective vessels and irrevocable harm to those carriers' customers by disruption of those other carriers' services. Harm to the flow of U.S. commerce via the Port of New York/New Jersey would be extremely serious.

16.     International ocean carriage by container vessel operators such as plaintiffs is very complex, requiring long-term planning of services and intricate coordination among the plaintiffs and the two other carriers with whom plaintiffs cooperate in their container operations. Plaintiffs and the other two cooperating carriers move thousands of 20 and 40 foot ocean containers through Maher's terminal annually, mostly under annual or multi-year contracts with customers.

17.     The announced intention of Maher to breach its Contract by denying terminal

services at its terminal has caused plaintiffs damaging uncertainty.  To stop the continuing

financial loss in paying Maher over a million dollars annually in CFC charges, plaintiffs would

be required to abandon their services to Port Elizabeth.  This adjustment would itself incur huge

expenses, including payments to the New York Shipping Association triggered by termination of

the services. While stopping service may be possible, it would not be practicable and such

change would cause massive disruption to the four carriers' services and harm to their customers

who depend on service to the Port for delivery of their cargoes to and from the large area to

which the Port is naturally tributary.

## COUNT ONE
## DECLARATORY JUDGMENT

18.     Defendant has advised that it intends to deny plaintiffs terminal services it is

obligated to perform, in the event plaintiffs do not pay the Port Authority CFC charges.  The

parties' interests are adverse and severe and substantial harm will result if declaratory judgment

is not entered.

19.     Plaintiffs have a contractual "slot charter" relationship with other ocean common

carriers, including COSCO Container Lines Co., Ltd. and Hanjin Shipping Company, Ltd. which

requires long-term planning and significant investments.  The four carriers engage in detailed

coordination of vessel operations which are intergral to their service to customers and all make

their respective vessels call the port for loading and discharging of containers.

20.     If defendant were to deny plaintiffs terminal services,  loading and delivery of

imports and exports by these Ocean Common Carriers and their cooperating slot charterers

would cease at the Port, at significant cost to all parties, and to the regional economy.

21. Any denial of terminal services by defendant will result in expenses in the millions of dollars to plaintiffs, their cooperating slot charterers, and their respective customers.

22. This action for Declaratory Judgment is filed to settle and clarify the plaintiffs' rights under the Contract.

23. This action is further brought pursuant to Federal Rules Civ. Pro. 57 and 28 USCA ¶ 2201.

24. There exists a genuine controversy between the parties herein that requires a ruling to settle the legal rights of all the parties. Plaintiffs will suffer severe and substantial hardship if declaratory judgment is not granted in their favor.

25. The defendant will not suffer any hardship by being required to continue providing terminal services as required under its Contract.

WHEREFORE, plaintiffs demand judgment against defendant declaring the Contract between the parties does not permit defendant's denial of terminal services to plaintiffs for non-payment of the CFC charges, and an Order enjoining defendant from denying terminal services to plaintiffs other than for non-payment for services specified in the Contract, together with costs and any other relief this Court deems just.

**COUNT TWO**
**SPECIFIC PERFORMANCE**

26. Plaintiffs repeat the allegations set forth in paragraphs 1-25 above and incorporate same herein as though set forth at length.

27. The executed Contract between the parties is valid and enforceable.

28. The terms of this Contract are clear that no provision thereunder accords defendant the right to deny terminal services to plaintiffs for non-payment of CFC charges.

29.   Plaintiffs are not in default or breach of any part of the Contract with defendant.

30.   Enforcement of the Contract would only require defendant to comply with contractually agreed upon terms, and would be neither harsh nor costly to defendant.

WHEREFORE, plaintiffs demand judgment against defendant declaring the Contract between the parties does not permit defendant the right to deny terminal services to plaintiffs for failure to pay CFC or any other charges not specified in the Contract, and for an Order enjoining defendant from denying terminal services to plaintiffs, together with costs and any other relief this Court deems just.

## COUNT THREE
## ANTICIPATORY BREACH

31.   Plaintiffs repeat all the allegations as set forth in paragraphs 1-30 above and incorporate same herein as though set forth at length.

32.   Maher, by its definite and unconditional declaration, has evinced its intent to deny terminal services to plaintiffs at its terminals for non-payment of CFC charges, an action which is not justified by any provision of its Contract with plaintiffs.

33.   By its own declaration, Maher has expressed that it will not render the performance guaranteed in the Contract it has executed with plaintiffs.

34.   Defendant's anticipated breach of the Contract will cause significant damage to plaintiffs, the local economy as well as the flow of United States export and import commerce.

WHEREFORE, plaintiffs demand judgment against defendant declaring the Contract between the parties does not permit defendant's denial of terminal services to plaintiffs other than for defaults in payments plaintiffs are obligated to make by the Contract and request an

Order enjoining defendant from denying terminal services to plaintiffs, together with costs and any other relief this Court deems just.

NOWELL AMOROSO KLEIN BIERMAN, P.A.

By:     /s/ William D. Bierman

William D. Bierman
155 Polifly Road
Hackensack, New Jersey 07601
(201) 343-5001

Attorneys for Plaintiffs,
Kawasaki Kisen Kaisha, Ltd. and
Yang Ming Marine Transport Corporation

Dated: October 4, 2012

# EXHIBIT 1

# STEVEDORING AND TERMINAL SERVICES AGREEMENT

*between*

## COSCO CONTAINER LINES CO., LTD.
## KAWASAKI KISEN KAISHA, LTD ("K" LINE)
## YANG MING MARINE TRANSPORT CORP.
## HANJIN SHIPPING COMPANY, LTD.

*and*

## MAHER TERMINALS LLC

August 28, 2009

This **AGREEMENT** is made and entered into this 28th day of August 2009 by and between **COSCO CONTAINER LINES CO., LTD., KAWASAKI KISEN KAISHA, LTD ("K" LINE), YANG MING MARINE TRANSPORT CORP., HANJIN SHIPPING CO., LTD.,** (herein **"CARRIER"**) and **MAHER TERMINALS LLC** (herein "CONTRACTOR"). The CARRIERS are participating jointly in this Agreement in order to facilitate efficient operations, and have no single legal personality, be it partnership, joint venture or any other type. Each **CARRIER** will be responsible for its own obligations and liabilities, whether under this contract or otherwise, to CONTRACTOR or any third party and no CARRIER will be liable for any claims or liabilities incurred or caused by any other **CARRIER.**

### SECTION 1: UNDERTAKINGS AND CONSIDERATIONS

For and in consideration of the covenants, undertakings and conditions herein mentioned it is mutually agreed between the parties hereto that **CONTRACTOR** will perform and each **CARRIER** will pay for each service to its vessels or containers as provided for in the attached rate schedule and the Amendments, if any, which constitute an integral part of this contract, properly executed by the parties from time to time, at **CONTRACTOR**'s terminal in Elizabeth, New Jersey, Port of New York and New Jersey (herein Terminal), for containers and other cargoes to be loaded on or discharged from container vessels owned, chartered, slot chartered and/or operated by **CARRIER,** or its containers carried aboard vessels operated by other slot charter parties, upon the terms, conditions and provisions herein provided.

1.    The regular or normal working day for both stevedoring and terminal operations shall consist of eight (8) hours from 8:00 a.m. to 12:00 noon, and from 1:00 p.m. to 5:00 p.m., and the regular or normal working week shall consist of forty (40) hours made up of five (5) regular or normal working days from Monday through Friday, inclusive, except legal holidays as specified by the NYSA-ILA Agreement.   Any other time in excess of the regular or normal working hours mentioned shall be considered overtime.

2.    All employees or laborers employed in the performance of services under this **AGREEMENT** shall be employees of **CONTRACTOR,** or its subcontractors, at all times and not of the **CARRIER,** unless otherwise provided for.

3.    Any slot charter arrangements made by **CARRIER** with third party carriers on a regular basis will necessitate a separate stevedoring and terminal agreement between the third

party carrier and the **CONTRACTOR**. If the third party carrier is not currently a user of CONTRACTOR's facility, those volumes will be applied to CARRIER throughput for purposes of calculating the tiered volume discount.

### SECTION 2: STEVEDORING AND TERMINAL SERVICES

**CONTRACTOR** will provide the following services for the vessels carrying **CARRIER**'s containers:

1.     The **CONTRACTOR** will provide berthing facilities for the container vessels of the **CARRIER** at the **CONTRACTOR'S** Terminal in Port Elizabeth, New Jersey. A safe berth with a draft ranging from 38' to 50' at MLW is presently available for the **CARRIER'S** vessels. **CONTRACTOR** warrants that **CARRIER'S** vessels will remain safely afloat, with the above draft parameters, provided at least forty-eight (48) hours advance notification of the intended draft is given to the **CONTRACTOR**.

2.     All necessary labor and Container gantry crane or cranes to handle containers and hatch covers of vessels.

3.     All necessary labor and container handling equipment to transport **CARRIER's** containers and those of slot charter parties or third parties on **CARRIER's** vessels to and from the yard and vessel.

4.     All necessary labor and supervision to perform the stevedoring operations.

5.     Clerks to perform clerical functions.

6.     Labor for handling of lines and docking and undocking of vessels.

7.     Check containers and container seals entering and exiting the terminal through the inbound and/or outbound lanes and ensure that all such seals are intact. If seal is missing or a discrepancy is found, the **CONTRACTOR** will immediately notify the **CARRIER**. Seal information will be recorded and sent to **CARRIER** via EDI.

8.     The planning and stowage of containers in accordance with prestow instructions of **CARRIER**. Prepare and furnish to **CARRIER** appropriate container stowage plan and related documents, including container weights, refrigerated cargo, hazardous and uncontainerized cargo and exception lists, prior to vessel's departure.

9.     Coordinate with the **CONTRACTOR'S** lashing subcontractor the planned working schedule and assure lashing gear is collected and stored in gear boxes or area provided on board the vessel.

10.     After work actually begins and the men are thereafter prevented from working

August 28, 2009

through no fault of the **CONTRACTOR,** the entire duration of all gang detention lasting ten (10) minutes or more per occurrence will be charged at the detention rate on a per gang basis. Repeated similar type detentions of less than ten (10) minutes caused by the **CARRIER** and occurring more than three (3) times per vessel are for **CARRIER's** account.

11. In the case of work interruption caused by the breakdown of one or more cranes there will be no straight time charge to **CARRIER** during that guarantee period. Overtime differential charges, if any, during that guarantee period, are for **CARRIER's** account. In such case, **CONTRACTOR** reserves the right to discontinue operations until repairs are completed. If **CARRIER** requests standby beyond the guarantee period when the breakdown occurred, all standby costs, both straight time and overtime will be for the account of the **CARRIER.** In any event, all overtime differential charges during the breakdown period or while the vessel is working, are for **CARRIER's** account. **CONTRACTOR** agrees to review, and potentially mitigate costs, with **CARRIER** for extraordinary crane down time on a case by case basis, based on mutual agreement.

12. **CONTRACTOR** warrants that its employees are trained in compliance with U.S. Department of Transportation and other government requirements for the handling and transportation of hazardous materials.

13. **CONTRACTOR** will be in compliance with all Governmental Maritime Security requirements as mandated by law.

14. **CARRIER** and **CONTRACTOR** will support each others efforts to introduce new technology that will enhance the operation. It is understood that such new technology may replace technology specifically provided under this Agreement.

15. **CONTRACTOR** will provide **CARRIER'S** with a designated area within the **CONTRACTOR'S** CY, in essence a "Terminal within a Terminal". The size of such an area will be dependent upon **CARRIER'S** throughput volume. The area will be able to adequately accommodate the **CARRIER'S** existing services, the unrestricted growth of existing services, as well as any new services the **CARRIER** may introduce during the term of this Agreement. Such an area will include:

    a. Guarantee of two (2) berths and when two (2) berths are occupied, **CONTRACTOR** guarantees a minimum of six (6) cranes.

    b. Guarantee CY area adjacent to berthing area

    c. Priority trucker interchange line for enhanced trucker service levels.

August 28, 2009

    d.  Priority straddle carriers with ability to add additional equipment during peak volume periods.

    e.  Guaranteed reefer handling area for enhanced truck service levels, contiguous to CY.

    f.  Centralized access to ExpressRail to facilitate swift vessel to rail transfers and vice versa.

    g.  **CARRIER** and **CONTRACTOR** agree to meet on a regular basis as required.

### SECTION 3: LANE AND YARD SERVICE

**CONTRACTOR** will provide during straight time hours:

1.    Labor, supervision, and equipment to perform yard services, and receiving and delivery of loaded and empty containers and chassis through the container lanes.

2.    Scale to weigh and record export container loads.

3.    Labor and supervision to inspect containers entering or exiting the terminal through the container lanes and to record the condition of the container; labor and supervision to visually inspect and prepare a TIR for **CARRIER'S** chassis received at **CONTRACTOR'S** chassis depot facility. Roadability under the Federal Highway Act and/or the Federal Motor Carrier Safety Regulations continues to be the sole responsibility of the trucker. **CONTRACTOR** will not accept into the Terminal, any empty container with hazardous placards or debris/dunnage.

4.    **CARRIER** authorizes **CONTRACTOR** to honor manifests, dock receipts, delivery orders or information submitted or electronically transmitted in mutually agreeable formats relating to cargo and containers for which **CONTRACTOR** performs service. Import containers shall be electronically freight released by the **CARRIER** or its representative to the **CONTRACTOR** for delivery. **CONTRACTOR** shall screen hazardous cargo documents to assure correctness. **CONTRACTOR** will be responsible to positively identify and document all pertinent parties involved for containers delivered to the consignees, their agents, servants, employees, and motor carriers.

5.    Preparation and electronic transmission to **CARRIER** of information incidental to the receipt and delivery of containers and cargo. **CONTRACTOR** will provide **CARRIER** with vessel pre-stow plan. Upon **CARRIER's** request, **CONTRACTOR** will cooperate with **CARRIER** to provide an EDI stow plan in EDI Fact Baplie 1.5 or 2.0 format.

6. **CARRIER** will limit its receiving of export container loads to one (1) scheduled vessel per service, unless mutually agreed.

7. **CONTRACTOR** to ensure accessibility for hazardous container inspection.

8. **CONTRACTOR** will provide sixty (60) days notice if it intends to change its gate hours.

### SECTION 4: DEMURRAGE, FREE TIME, TRUCK LOADING

1. Free time and demurrage for import and export full containers and loose cargo shall be governed by the regulations and rates contained in the Maher Terminals Schedule (Tariff) in effect and filed with or made available to the Federal Maritime Commission or any future revisions to this schedule. **CARRIER** will be notified by **CONTRACTOR** of any schedule (tariff) related changes a minimum of forty (45) days prior to the effective date. Resulting charges for demurrage shall be collected and retained by **CONTRACTOR**. **CARRIER** shall have the option to implement its own Terminal Schedule (Tariff) providing the free time is the same or less than **CONTRACTOR'S** Terminal Schedule (Tariff) and the demurrage rates are the same or higher than **CONTRACTOR'S** Terminal Schedule (Tariff). In the event **CARRIER** elects to file its own Terminal Schedule (Tariff) with the FMC, **CONTRACTOR** agrees to share in demurrage revenues collected in excess of those generated by **CONTRACTOR'S** own Terminal Schedule (Tariff) as mutually agreed.

2. All revenues for services provided in connection with the loading and discharging of railroad cars, lighters, barges, scows, and motor truck carriers, and any other service provided for in the Terminal Schedule shall be collected and retained by **CONTRACTOR**.

### SECTION 5: WATCHING SERVICE

1. **CONTRACTOR** will provide twenty-four (24) hours per day, unarmed, watching service.

2. In the event increased local, state, and/or federal Government security requirements, or other requirements, result in increased costs for the **CONTRACTOR**, **CARRIER** will not unreasonably withhold approval of terminal related surcharges, if any.

### SECTION 6: OBLIGATIONS OF CARRIER

1. Engage **CONTRACTOR** during the term of this Agreement, as its exclusive contractor in the Port of New York area for the performance of any and all of the services enumerated herein in connection with all container stevedoring and terminal services provided for **CARRIER'S** services calling the Port of New York and New Jersey.

**CONTRACTOR** acknowledges that certain of the **CARRIERS** currently,

or in the future, may participate in slot-charter agreements or vessel sharing arrangements where **CARRIER** is a minority partner, as such, certain cargo is handled at a terminal in the Port other than **CONTRACTOR'S**. **CARRIERS** with such agreements agree to use their best efforts to arrange for such cargo to be handled by **CONTRACTOR**.

2.      Promptly remove its vessel from berth, weather and tidal conditions permitting, upon request of **CONTRACTOR** if vessel has completed loading and/or discharging and berth is required by **CONTRACTOR**.

3.      Before operations commence, provide **CONTRACTOR** with all necessary information, instructions and forms covering vessel and container, including container load plan, loading, discharging, stowage, vessel's trim, reefer temperature control, hazardous containers, condition of containers, cargo requiring special handling and marking, routing, manifests, and billing instructions to enable **CONTRACTOR** to provide efficient and economical service.

4.      Submit to **CONTRACTOR** all necessary documents pertaining to the discharge of vessels as soon as possible but in any case not later than two (2) full normal working days prior to arrival of vessel, and for loading one (1) full day prior to the arrival of the vessel.

5.      **CARRIER** will exercise its best efforts to deliver export FCL containers and documentation to the Terminal not later than the close of business the working day before arrival of the vessel.

6.      The **CARRIER** will provide hazardous and label cargo lists pursuant to International, Federal and Local regulations and will arrange that such cargoes be delivered to Terminal not more than forty-eight (48) hours prior to arrival of vessel. The **CARRIER** must assure that all hazardous cargo containers are properly placarded in accordance with existing IMCO International Maritime Dangerous Goods Code and/or U.S. Coast Guard regulations. The **CONTRACTOR** will verify the proper placarding in accordance with the above regulations and report any discrepancies found promptly to **CARRIER**.

7.      **CARRIER** agrees to provide **CONTRACTOR** three (3) weight categories (light, medium, heavy), as determined by the **CARRIER**, for the receiving and stacking of export loads and to load vessels within these weight parameters.

8.      **CARRIER** agrees to sign NYSA/ILA Labor Agreement and/or be a member of the United States Maritime Alliance (USMX) for the period covered by this **CONTRACT** and to pay the prevailing tonnage assessments and container royalties which may be due to the appropriate entities.

August 28, 2009

9.     **CARRIER** agrees to pay all invoices as soon as possible but not later than thirty (30) calendar days from receipt of invoice. **CONTRACTOR** agrees to $1.50 per unit discount of the commodity invoice if **CARRIER** pays such invoice by wire transfer within 15 calendar days of receipt date. Such discount will be provided in the form of a check within thirty (30) days after **CONTRACTOR** has received payment in full from **CARRIER,** providing **CARRIERS** commodity invoice account is in good standing with **CONTRACTOR.** In the event of a discrepancy or dispute of any invoice prepared by the **CONTRACTOR,** the **CARRIER** shall pay the undisputed amount not later than thirty (30) calendar days from presentation. The **CARRIER** shall bring the disputed amount to the attention of **CONTRACTOR** in writing as soon as noted for clarification or adjustment.

10.     **CARRIER** and **CONTRACTOR** agree to work together to find a more economical chassis option as soon as possible.

11.     **CARRIER** agrees to utilize **CONTRACTOR'S** designated off terminal satellite facilities, if any, for the receiving and delivery of empty containers. It is understood that **CARRIER** will utilize **CONTRACTOR'S** Marine Terminal for only those empty containers designated for loading to vessel or rail. **CARRIERS** have the option to move empties to a depot of their choice.

12.     **CARRIER** agrees to assist in **CONTRACTOR'S** efforts to reduce equipment dwell time where possible and commercially viable.

### SECTION 7: RESPONSIBILITY FOR DAMAGE OR LOSS

1.     The **CONTRACTOR** shall be legally liable for loss of or physical damage to the vessels and their equipment and appurtenances as well as containers and for loss of or physical damage to cargo including loss of cargo overside, through the negligence of the **CONTRACTOR,** its employees, agents or servants, provided that **CONTRACTOR's** attention is called to such loss or damage as soon as practicable after discovery of the loss or damage. With respect to vessel damage, **CARRIER** agrees to take reasonable steps to identify any alleged vessel damage and give notice prior to vessel departure. **CONTRACTOR** shall be entitled to appoint an independent surveyor to attend on board vessel at her next scheduled port of call for the purposes of carrying out a without prejudice examination of any alleged vessel damage not examined prior to the vessel's departure from the terminal. With respect to claims for loss of or damage to cargo, the liability of the **CONTRACTOR** will be limited to physical damage or loss caused by the negligence of the **CONTRACTOR,** its employees, agents or servants and to such

August 28, 2009

claims that result from fraud or breach of trust on the part of employees, agents or servants of the **CONTRACTOR** engaged in the delivery, receiving and watching of such cargo.

2.     Containers furnished by the **CARRIER** for loading and/or unloading will be sound, watertight, seaworthy and in compliance with all legal and statutory safety standards, so that **CONTRACTOR** may safely use small forklifts inside the containers while mounted on chassis to perform the vanning and devanning operations. All containers to be hoisted and including hatch covers must have ISO fittings. The **CARRIER** agrees to inspect the stowage of containers to ensure adequacy of stowage prior to the vessel's departure.

3.     It is mutually agreed that the **CONTRACTOR** will not be responsible for:

a. Claims due to spoilage to perishable goods carried in containers, unless the **CONTRACTOR** failed to render the services customarily required for such cargo, under proper information from the **CARRIER**.

b. Loss of or damage to containers and/or cargo where it is found that the container is damaged, has holes, sprung doors, broken seals or locking devices, unless such damages to container are caused by the **CONTRACTOR**.

c. Loss of or damage to cargo in containers found upon discharge not to have been properly blocked, chocked and secured.

d. Loss of or damage to containers and/or cargo caused by a force majeure as defined in Section 9 hereof.

4.     To the extent permissible under applicable law, the **CARRIER** agrees to set forth in its Bill of Lading a provision which will effectively make available to the **CONTRACTOR** all rights, protections and limitations of liability available to the **CARRIER** under the Carriage of Goods by Sea Act of the United States including but not limited to the $500 package limitation. The **CARRIER**'s Bill of Lading shall contain a proper "Custody Clause" (Period of Responsibility Clause) which will protect the **CARRIER/CONTRACTOR** from the time the goods are received at the port of loading until delivered at the port of discharge. A copy of carrier's bill of lading is attached and shall be deemed to satisfy the requirements of this clause.

It is expressly agreed by the **CARRIER** that should such Bill of Lading

August 28, 2009

provisions as attached hereto not be maintained in effect, the **CARRIER** will indemnify **CONTRACTOR** for those sums that it is liable for over and above the limitation of liability defenses.

When **CARRIER** accepts cargo on an ad valorem basis, the **CONTRACTOR** shall not be responsible for increased liability unless **CARRIER** gives written notice in advance to the **CONTRACTOR** in sufficient time for the **CONTRACTOR** to provide special handling and/or supervision; and extra charges therefore shall be agreed upon between the parties at the time such notice is given. Such notice shall include a description of the quantity, nature and location of the goods.

### SECTION 8: INSURANCE

It is understood and agreed that insurance requirements contained in this Agreement are in relation to the liability exposures of the **CARRIER** or any of their subsidiary companies acting as agent(s) to the **CARRIER**. As such, each **CARRIER** or its agent authorized to enter this Agreement on behalf of the **CARRIER** as their interests may appear. During the term hereof, the **CARRIER** or their agents shall, at their own cost and expense, maintain and shall provide evidence that the following insurance coverages are in force during their operations on **CONTRACTOR** terminal properties:

1. Workers' Compensation and Employer's Liability Insurance covering all persons in employ of the **CARRIER'S** Agent. Such insurance shall be provided in accordance with all applicable federal and state laws. Employer's Liability Insurance limits shall not be less than One Hundred Thousand ($100,000.00) Dollars per accident and One Hundred Thousand ($100,000.00) Dollars per employee for disease claims.

2. Automobile Liability Insurance (Agent only) to cover any auto owned, leased, borrowed or otherwise used by the Agent's employees. Automobile Liability Insurance shall be in the amount of not less than One Million ($1,000,000.00) Dollars combined single limit for Bodily Injuries and Property Damage Liabilities if the policy is issued with separate limits. The policy or policies shall be at least as broad as that provided by the latest edition of the Business Automobile Policy promulgated by the Insurance Services Office (ISO). All truckers coming on **CONTRACTOR** property shall be signatories to the Uniform Intermodal Interchange Agreement and the respective **CARRIER'S** addenda (copies attached hereto), **CONTRACTOR** shall be furnished with lists of such signatory truckers and **CONTRACTOR** shall have the responsibility for allowing only signatories on its property.

August 28, 2009

3.  Property or Inland Marine Insurance as the **CARRIER** may deem advisable on any personal property, cargo, equipment or other property which is owned or leased by the **CARRIER** or in the **CARRIER'S**, care, custody or control.  In addition, the **CARRIER** shall maintain coverage with terms and conditions made available to the **CONTRACTOR** upon request.

4.  Each **CARRIER** shall participate in a Protection and Indemnity Club that is satisfactory to **CONTRACTOR**.  Each **CARRIER** shall provide to **CONTRACTOR** evidence of Protection and Indemnity and Hull Coverage with the running down clause covering any watercraft used in this Agreement.  Such coverage shall include a provision providing for wreck removal. Each **CARRIER** shall participate in a Club covering inland transport to furnish coverage to complement P&I coverage for through transportation.

5.  The above insurance policies shall remain in full force and effect and shall not be canceled, allowed to lapse or allowed to expire until a minimum of thirty-30-days after the **CONTRACTOR**, Risk Management Department, has received written notice thereof.

6.  The **CONTRACTOR** shall maintain insurance coverage and furnish to the **CARRIER** certificates of insurance as set forth below:

> a.  Worker's Compensation Insurance for its employees as required by applicable Federal and State laws.
> b.  Comprehensive General Liability Insurance in the amount of $20,000,000 for bodily injury.
> c.  Liability Insurance for loss of or physical damage to vessels, chassis, containers and cargo in the amount of $20,000,000.

### SECTION 9: FORCE MAJEURE

Should unusual conditions occur, without any negligence or fault of the **CONTRACTOR**, including without limitation, damage or destruction to premises or facilities, including vessels or containers, by fire, flood, riot, earthquakes, windstorms, tidal wave, explosion, Acts of God, the public enemy or other casualty, or should the operation by the **CONTRACTOR** be suspended, abated, prevented, or impaired by reason of war, war-like operations, seizure, marine casualty, Governmental decree of regulation, strikes or other labor disputes, lockout or other work stoppage or by reason of any other condition beyond the control of **CONTRACTOR** or vessel so as to render the Terminal wholly or partially untenable or unfit for use or so as to make it impractical for the vessel or **CONTRACTOR** to make reasonable or

August 28, 2009

full use thereof, then **CONTRACTOR** may suspend or reduce services without responsibility for any claim by vessel or others arising out of such service suspension or reduction. Under such circumstances, **CARRIER** will have the right to operate at a terminal other than **CONTRACTOR**'s terminal.

Should unusual conditions occur, without any negligence or fault of the **CARRIER**, including without limitation, damage or destruction to premises or facilities, including vessels or containers, by fire, flood, riot, earthquakes, windstorms, tidal wave, explosion, Acts of God, the public enemy or other casualty, then **CARRIER** will not be held liable for damage or destruction to **CONTRACTOR'S** premises, facilities or container handling equipment exclusively due to Force Majeure conditions.

### SECTION 10: OVERTIME AND MEAL HOUR

Overtime and meal hour time in the CY Lanes, when worked at the specific request and authorization of the **CARRIER** in writing, will be charged and paid at the rates set forth in Schedule A. Vessel overtime, ILA deadtime in overtime or for Meal Hour Rates, see Schedule A.

### SECTION 11: EXTRA LABOR

Whenever **CONTRACTOR** is requested in writing by the **CARRIER** to supply Extra Labor and/or equipment to perform Extra Labor services for those items not specified within the attached schedules the charges will be made as provided in Schedule A attached hereto.

### SECTION 12: PENALTY WAGES FOR THE HANDLING OF DISTRESSED CARGO.

Whenever penalty wages are to be paid pursuant to the provisions of the NYSA/ILA Agreement, such additional penalty costs shall be charged to the **CARRIER** in addition to the rates applicable in Schedule A together with the costs of protective accessories, gear and equipment.

### SECTION 13: RATE ADJUSTMENTS

The composite increase or decrease in labor elements such as wages, fringe benefits, payroll related items, assessments, taxes and insurance, coupled with non-labor elements governed by changes in the annual Consumer Price Index (CPI) shall provide the basis for the yearly adjustment effective each October 1st to all rates contained in this Agreement.

Sixty percent (60%) of the container rate shall be subject to a labor cost increase or decrease. The remaining forty percent (40%) of the container rate shall be subject to adjustment as per CPI Northeast Region as published annually by the U.S. Department of Labor. All other

August 28, 2009

rates shall also be subject to an increase or decrease of one hundred percent (100%) of the combined net effect of the percentage between labor and non labor costs.

Annual rate adjustments shall be no less than 2% (minimum cap) and no more than 4.5% (maximum cap) through September 30, 2011. Effective October 1, 2011, in the event the maximum cap is exceeded **CARRIER** and **CONTRACTOR** agree to share equally in the percentage increase beyond 4.5% as per the following examples:

**Example 1:**

Annual adjustment calculation = 1.5 %, then the 2% minimum adjustment will apply

**Example 2:**

Annual adjustment calculation = 6.5%, then the actual adjustment will be 5.5%

To offset any significant increase in fuel prices **CONTRACTOR** may introduce during the term of this Agreement, a fuel related surcharge assessed for each throughput handled at its facility using the price of diesel fuel on the date of contract signing as the base. Such a fuel surcharge will be supported by a U.S. East Coast fuel price index published by the Department of Energy and the base point and calculation method must be mutually agreed among the parties.

Any items found in the **CONTRACTOR'S** tariff (Schedule 010599), which are traditionally charged to the **CARRIER**, will not be increased unless mutually agreed. Any future surcharges, if any, chargeable to the **CARRIER**, will need to be mutually agreed.

## SECTION 14: SAFETY REGISTERS AND CERTIFICATES

It is expressly understood that in the event any vessel fails to comply with State or Federal or fails to have on board any other certificates required by law, all charges and penalties arising out of such failure shall be for the account of the **CARRIER**.

## SECTION 15: ROADABILITY REPAIRS AND MAINTENANCE AND REPAIRS

**CARRIER** agrees to engage **CONTRACTOR** for all roadability repair performed at the Terminal upon **CARRIER**'s containers, as per terms, conditions and rates mutually agreed upon. **CARRIER** further agrees that it will engage only **CONTRACTOR** at **CARRIER'S** direction for any other repairs or maintenance performed at **CONTRACTOR's** Terminal. Maintenance and repair of **CARRIER'S** chassis is governed by the applicable Chassis Pool Agreement.

**CONTRACTOR** will provide land and current services to accommodate **CARRIER'S** chassis required for the units being contracted under this agreement, unless other arrangements are made by **CARRIER**. This requirement will be reviewed annually.

August 28, 2009

### SECTION 16: TERMINAL PREMISES RULES AND REGULATIONS

To ensure safety and security **CONTRACTOR** has promulgated regulations governing persons and equipment on the Terminal and the **CARRIER** agrees to cooperate in enforcing such regulations with respect to its agents, employees, servants, contractors, guests and invitees.

### SECTION 17: PERIOD OF AGREEMENT

This **AGREEMENT** is effective on the 1st day of January 2010 and will continue for five (5) years through the 31st day of December 2014.

This contract may be extended by the **CARRIER** for two (2) additional years through December 31, 2016, however, **CARRIER** must give **CONTRACTOR** written notice of their intention by October 1, 2014.

This Agreement may be further extended for an additional three (3) years through December 31, 2019, providing both parties are in agreement to extend the term and written notice is exchanged by October 1, 2016.

In the event there is no extension of this **AGREEMENT**, **CONTRACTOR** shall at the option of the **CARRIER**, continue to be responsible for the completion of any stevedoring, terminal and services which **CONTRACTOR** is in the process of performing. **CONTRACTOR** will receive payment for these services as specified in this **AGREEMENT**.

### SECTION 18: PERFORMANCE CLAUSE

In the event the **CONTRACTOR** consistently fails to meet any of its obligations under this Agreement, including the performance guarantees noted in Addendum II, the **CARRIER** may give the **CONTRACTOR** ninety (90) days notice in writing of its intention to withdraw from the Agreement. If within ninety (90) days from the date of receipt of such notice, the **CONTRACTOR** corrects its breach, then the **CARRIER** shall cancel such notice of intention to withdraw from the Agreement. In the event the **CONTRACTOR** fails to make such correction within ninety (90) days, **CARRIER** shall be entitled to withdraw from this Agreement sixty (60) days after the original ninety (90) day period.

**CONTRACTOR** shall, at the option of **CARRIER,** continue to be responsible for the completion of any stevedoring and terminal services which **CONTRACTOR** will receive payment for these services as the parties may agree.

### SECTION 19: MODIFICATION OF AGREEMENT

This agreement may be amended, modified or supplemented at any time by mutual consent expressed in writing by the parties hereto.

August 28, 2009

## SECTION 20:  CHOICE OF LAW AND FORUM SELECTION

Any dispute arising under and in connection with this Stevedoring and Terminal Agreement shall be governed by the laws of the State of New Jersey and determined by the courts located therein both State and Federal. The **CARRIER** states that it is not its intention to bind contractor to the forum selection clause in any of its bills of lading pursuant to which cargo moves through contractor's marine terminal

This agreement and all the provisions thereof shall be governed by the Laws of the State of New Jersey.

### SECTION 21:  NOTICES

Notices by either party to the other, pursuant to this agreement shall be directed to the following respective addresses, or such addresses as the parties may from time to time designate:

NOTICE TO CARRIER:

NOTICE TO CONTRACTOR:

**COSCO CONTAINER LINES CO., LTD.**
100 Lighting Way
Secaucus, NJ  07094

**MAHER TERMINALS LLC**
1210 Corbin Street
Elizabeth, N.J.  07201

**K-LINE SHIPPING COMPANY**
890 Mountain Avenue
Murray Hill, NJ  07974

**YANG MING (AMERICA) CORP.**
525 Washington Blvd, 25th Floor
Jersey City, NJ  07301

**HANJIN SHIPPING**
80 East Route 4
Paramus, NJ  07652

### SECTION 22:  REPRESENTATION

Both parties shall, at all times, comply fully with all applicable laws and regulations issued by any authority having jurisdiction.  Both parties expressly warrant that the individual executing this contract on its behalf is a duly authorized representation of the party, and has full authority to execute this contract on the party's behalf.

August 28, 2009

## SECTION 23: CONFIDENTIALITY

The parties agree not to make use of or disclose to third parties any and all data concerning any information and/or any terms contained herein without first securing the written consent of the other party, except where such data is required by authority of law.

**IN WITNESS THEREOF**, the parties hereto have caused these presents to be executed by their respective duly authorized representatives this _____ day of _____ 2009.

August 28, 2009

YANG MING (AMERICA) CORP.
FOR AND ON BEHALF OF
YANG MING MARINE TRANSPORT CORP.

By: _____

Date: _____ 8/28/09 _____

MAHER TERMINALS LLC

By: _____

Date: _____ 8 / 2 8 / 0 9 _____

By: _____

Date: _____ 8/28/09 _____

W I T N E S S E D   BY:

8/28/09

August 28, 2009

- 19 -